[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 18-11059, 18-11539
Non-Argument Calendar
_____

D.C. Docket No. 3:15-cv-107-J-34JBT

ABDULLAH M. AL-RAYES, et al.,

Plaintiffs-Appellants,

versus

ERIKA M. WILLINGHAM,
individually and as Trustee of the
ERIKA M. WILLINGHAM TRUST,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(February 5, 2019)

Before JILL PRYOR, BRANCH, and GRANT, Circuit Judges.

GRANT, Circuit Judge:

The creditors in this case claim that a husband and wife worked together to commit multiple acts of mail and wire fraud over several years for the purpose of

hiding the husband's assets—acts which, in the creditors' telling, violated RICO. The creditors sued the wife. While the district court agreed that the couple may have committed the alleged acts of fraud, it nonetheless granted the wife's motion for summary judgment. According to the court, because the couple's marriage predated the alleged RICO acts, and the couple had created no sort of structure external to their marital relationship, no reasonable juror could conclude that they "formed an organization with some sort of framework, formal or informal, for the purpose of engaging in racketeering activity." In other words, to put it in RICO terms, the court found no evidence of an "association-in-fact" enterprise. We are convinced otherwise; after a thorough review of the record, we conclude that a genuine factual dispute exists about whether this couple formed an association-in-fact enterprise separate and apart from their marital relationship. We therefore reverse the district court's order granting summary judgment and remand for further proceedings. We also vacate the district court's order awarding the wife costs.

## I.

Abdullah Al-Rayes and various corporate entities under his control (collectively "Al-Rayes") sued Ben Willingham and several of his businesses, asserting that Ben defrauded Al-Rayes over the course of many real-estate transactions. Roughly a year after that 2006 lawsuit, Al-Rayes received a $25.7 million consent judgment against Ben. But after more than a decade, he has been able to collect only $39,943.81. Al-Rayes now argues that Ben's wife, Erika Willingham, has stymied his efforts to collect the judgment by working with Ben

2

to execute an intricate asset-concealment scheme.  Viewed in the light most favorable to Al-Rayes as the nonmovant, the record reflects the following facts.

According to Al-Rayes, Erika and Ben's scheme to hide Ben's assets involved secretly transferring funds to offshore bank accounts.  Their efforts to conceal those accounts began shortly after Al-Rayes secured the consent judgment against Ben.  Less than a year after that judgment was entered, Al-Rayes's counsel deposed Ben as part of an attempt to collect the judgment.  Ben testified that he did not have any accounts or assets in Switzerland, where Erika was from and where he and Erika had previously lived.  Ben also swore that Erika did have a single Swiss bank account in her name, but that she had sole control over it.  According to Ben, Erika made wire transfers from her Swiss account to the couple's joint account in the United States, and then used that money to pay for living expenses.  Erika, on the other hand, testified that she had no Swiss bank accounts in her name, and that her husband controlled all of her financial matters.

Additional facts emerged a few years later when Ben filed for bankruptcy and Al-Rayes renewed his attempt to collect the consent judgment.  During the proceedings, Erika stood by her earlier testimony that she did not have any bank accounts in Switzerland.  But the bankruptcy court concluded otherwise, finding that approximately 68 wire transfers were made from a Swiss bank account held only in Erika's name to the couple's joint account in the United States.  Those transfers, totaling $255,740, were all made within approximately three years of the consent judgment.

3

Bank records subsequently turned over to the bankruptcy court revealed that over an eleven-year span Erika and Ben (individually or together) made at least 240 wire transfers of Ben's salary and benefits to Erika's known Swiss account and to other (previously undisclosed) Swiss accounts held in Erika's name. When confronted with these records, Ben admitted that—despite his prior testimony that he had no control over his wife's (purportedly) single Swiss bank account—he actually had signatory authority over four Swiss bank accounts held in Erika's name. He also conceded that—contrary to his prior testimony that he had no assets in Switzerland—he had made numerous transfers of his salary, benefits, and tax refunds to Erika's Swiss accounts. Following these admissions, he acknowledged that he and Erika had used Swiss funds to pay their living expenses.

Still, the parties dispute the extent of Erika's involvement in these transfers. For his part, Al-Rayes cites Ben's testimony that his wife was aware that he was making the transfers, consented to the transfers, and even initiated some of the transfers herself. Erika, on the other hand, consistently testified that her husband had sole control over her finances and that she did not know about the Swiss accounts or any transfers involving those accounts.

Al-Rayes's allegations do not end there; he argues that Erika and Ben misrepresented not only the location of Ben's assets, but also their extent. For example, Al-Rayes points to Ben's declaration to the bankruptcy court that he and Erika had no significant assets and a combined monthly income of $4,062. Only a week after that declaration, however, the couple applied to a retirement community and represented that they owned $750,000 in real estate, $395,000 in investments,

4

and $40,000 in cash.  And subsequent events showed that the couple did have available assets; a few months later, they paid the retirement community a $254,962.50 entrance fee.

The couple also failed to notify the bankruptcy court of two important real-estate transactions made while the bankruptcy action was pending.  First, they sold their house and received $334,295.53 in net proceeds, but failed to notify either the bankruptcy court or Al-Rayes.  Moreover, both Erika and Ben paid for the house and signed the mortgage, but the title was in Erika's name only, shielding Ben's funds from creditors who were seeking his assets.  And a few months later, the couple purchased a condo for $120,000 and again failed to notify the bankruptcy court or Al-Rayes.  Like the house, the condo was purchased using funds from a joint account, but title was placed in Erika's name alone—again, Al-Rayes contends, in an attempt to hide Ben's assets.

These were not the only transactions that went unreported.  The couple also failed to notify the bankruptcy court or Al-Rayes when they received a partial refund of their retirement-home entrance fee after moving out early.  And they failed to notify the bankruptcy court or Al-Rayes when Erika created a trust, named herself as trustee, and executed a quitclaim deed transferring the condo title to herself as trustee, while reserving a life estate in the condo for herself—and for her husband.

Their alleged scheme did not end there.  A few months before the bankruptcy action closed, Erika and Ben formed a corporation—Osborn of Jacksonville, Inc.—purportedly to market a book that Ben had written.  In the four

months between Osborn's creation and the close of the bankruptcy action, Ben made several transfers totaling $176,630 from the couple's joint bank account to the corporation's bank account. He did not notify the bankruptcy court or Al-Rayes of those transfers, and later admitted to using funds from the corporation's account to pay the couple's personal expenses.

In light of these acts, Al-Rayes sued Erika[1] in the United States District Court for the Middle District of Florida, alleging that she violated RICO, 18 U.S.C. § 1962(c); conspired to violate RICO, 18 U.S.C. § 1962(d); and violated several Florida laws. To support the RICO claims, Al-Rayes alleged that Erika and Ben formed an association-in-fact enterprise by working together to conceal Ben's assets. After thorough discovery, the district court granted Erika's summary judgment motion, holding that both RICO claims failed because no reasonable juror could find that Erika and Ben together constituted an association-in-fact enterprise. Specifically, the court determined that the facts here could not satisfy the Supreme Court's requirement that individuals in an association-in-fact enterprise were "associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

In evaluating whether Erika and Ben could be considered an association-in-fact enterprise under RICO, the court acknowledged that the two "are associated in

---

[1] For whatever reason, Ben Willingham is not a party to this action. The Complaint states that Al-Rayes sued Erika Willingham because she "orchestrated and carried out a convoluted fraudulent scheme to conceal [Ben's] assets in order to hinder, delay, and impede" Al-Rayes's ability to collect the consent judgment. Also, Erika is the sole trustee of the Erika Willingham Trust.

marriage, and in the course of that marriage engaged in acts which may constitute mail or wire fraud." Still, the court determined, the couple could not constitute an association-in-fact enterprise because "there is no evidence to suggest that they associated together *for that purpose.*" The court indicated that Al-Rayes nevertheless could have shown an association-in-fact enterprise if he had alleged that the enterprise was—or at least included—a business or other separate entity run by Erika and Ben. But because the alleged enterprise lacked a non-marital component, the court concluded that Al-Rayes had failed to present sufficient evidence of a RICO enterprise.

Having disposed of both federal RICO claims, the court declined to exercise supplemental jurisdiction over the remaining state-law claims. The court later deemed Erika a prevailing party and awarded her $2,661.72 in costs under Federal Rule of Civil Procedure 54(d)(1). Al-Rayes now appeals, challenging both the order granting summary judgment and the order awarding costs.

## II.

On appeal from a grant of summary judgment, this Court reviews legal questions *de novo. Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918–19 (11th Cir. 1993). We also conduct a *de novo* review of the evidence, viewing all evidence in the light most favorable to the nonmoving party and resolving all reasonable inferences in favor of the nonmoving party. *Id.* As for the award of costs, whether "the facts as found suffice to render the plaintiff a 'prevailing party' is a legal question reviewed *de novo*." *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1321 (11th Cir. 2001) (citation omitted).

7

III.

RICO is widely regarded as a broad statute; indeed, the RICO text itself "provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Boyle*, 556 U.S. at 944 (quoting Pub. L. No. § 904(a), 84 Stat. 922, 947 (1970)); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) ("RICO is to be read broadly."); *Russello v. United States*, 464 U.S. 16, 21 (1983) (recognizing "the pattern of the RICO statute in utilizing terms and concepts of breadth"); *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1227 (11th Cir. 2014) (observing that "civil RICO targets a broad category of criminally fraudulent acts").  This breadth of language (and, we will see, of construction) is evident in the provision of RICO at issue in this case:  RICO makes it "unlawful for any person employed by or associated with *any enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c) (emphasis added).[2]

"Enterprise," in turn, is defined to encompass "any individual, partnership, corporation, association, or other legal entity, and *any union or group of individuals associated in fact although not a legal entity*."  18 U.S.C. § 1961(4) (emphasis added).  As the Supreme Court has emphasized, the "term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact

---

[2] "A violation of § 1962(c)" requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima*, 473 U.S. at 496.

is expansive." *Boyle*, 556 U.S. at 944 (citation omitted). Along those lines, the Supreme Court has "succinctly" defined an association-in-fact enterprise as any "group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 946 (quoting *Turkette*, 452 U.S. at 583). In keeping with that general definition, an association-in-fact enterprise may be "formal or informal," and requires only "three 'structural features': (1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (first quoting *Turkette*, 452 U.S. at 583; and then quoting *Boyle*, 556 U.S. at 946).

Here, the district court granted summary judgment because it determined that the evidence was insufficient to satisfy *Boyle's* "purpose" requirement. The district court's order acknowledges the rather obvious point that as a married couple Erika and Ben have a relationship, and goes on to conclude that "in the course of that marriage [the couple] engaged in acts which may constitute mail or wire fraud." Still, the district court declined to recognize Erika and Ben as an association-in-fact enterprise because the record lacked evidence that they originally married *for the purpose* of engaging in mail or wire fraud. The district court was careful to note that it was not ruling out the possibility that a married couple could form an enterprise. But the court also indicated that, so long as a couple does not "get married for the purpose of engaging in racketeering activity," some additional structure or vehicle must be alleged for the pair to qualify as an association-in-fact enterprise; this requirement seemed to reflect a view that the

9

formation of a new entity would somehow demonstrate a new shared purpose between the couple that eclipsed their prior marital intentions.

We disagree. As an initial matter, to satisfy the purpose requirement, neither the text of RICO nor any relevant precedent requires an association-in-fact enterprise to consist of strangers who originally met for the purpose of engaging in illegal activity. "That an 'enterprise' must have a purpose is apparent from the meaning of the term in ordinary usage, *i.e.*, a 'venture,' 'undertaking,' or 'project.'" *Boyle*, 556 U.S. at 946 (quoting Webster's Third New International Dictionary 757 (1976)). Thus, the "concept of 'associat[ion]' requires both interpersonal relationships and a common interest." *Id.* (alteration in original). Nothing in that description prevents individuals with preexisting relationships— say, family members or business partners—from later joining together for the common purpose of engaging in illegal activity. So, unsurprisingly, federal courts have routinely recognized association-in-fact enterprises made up of individuals who had relationships that predated their schemes. *See, e.g.*, *Crowe v. Henry*, 43 F.3d 198, 201, 205 (5th Cir. 1995) (plaintiff adequately pleaded an association-in-fact enterprise consisting of two people who originally met as "friends and business associates"); *United States v. Torres Lopez*, 851 F.2d 520, 528 (1st Cir. 1988) (evidence was sufficient for a rational trier of fact to find that a RICO enterprise consisted of a group of police officers who met as members of the Puerto Rico Police Department and then joined together to engage in criminal conduct for pay); *Nesbitt v. Regas*, No. 13 C 8245, 2015 WL 1331291, at *7 (N.D. Ill. Mar. 20, 2015) (plaintiff adequately pleaded that people with longtime "family

10

and business relationships" formed an association-in-fact enterprise).  We can see, then, that the relevant "purpose" in an association-in-fact enterprise is the members' shared purpose of engaging in illegal activity—not the purpose for which they initially became acquainted.

Moreover, neither the text of RICO nor any relevant precedent imposes a heightened "structure" requirement for married couples.  But the district court appears to have done just that.  While it may not have described it as mandatory, the district court's explanation of how a married couple could form an association-in-fact enterprise under RICO is telling.  The court emphasized that an enterprise must be a "vehicle" and that "some discernable structure is still required."  The court then went on to deem it "[s]ignificant[]" that the RICO enterprise here "does not encompass the actions of Ben Willingham's business entities."[3]  The court also concluded that the couple's actions to hide Ben's assets were those of a "husband and wife, conducting the personal affairs of Erika and Ben Willingham, not the affairs of a separate 'enterprise.'"

In so reasoning, the court imposed a requirement that the Supreme Court has already expressly rejected in *Boyle*.  When presented with the assertion that "the

---

[3] The corporation formed by the couple deserves a brief discussion.  The district court stated that while "Ben Willingham did incorporate Osborn, allegedly as part of his concealment efforts, Creditors do not allege that Osborn is the RICO enterprise, or even a part of the enterprise, at issue here."  A more generous reading of the Complaint could indicate that Al-Rayes *did* allege that Osborn was part of the enterprise; that document contends that Erika and Ben "formed a scheme or artifice to defraud" Al-Rayes that included, among other things, "creating" Osborn "and using Osborn's bank accounts to further launder funds that were subsequently used to pay for personal expenses."  But whether Osborn is viewed as a part of the alleged RICO enterprise is not dispositive because an association-in-fact enterprise need not include a corporation or other formal structure in any event.

11

definition of a RICO enterprise is limited to 'businesslike entities,'" the Supreme Court stated that it saw "no basis to impose such an extratextual requirement." *Boyle*, 556 U.S. at 945. Not only has the Supreme Court rejected the assertion that an association-in-fact enterprise must be "businesslike," it has also instructed lower courts not to require that association-in-fact enterprises have the formal characteristics often associated with businesses or other legal entities. For example, the Supreme Court has stated that the group comprising the association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command,'" and the "group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* at 948. In light of *Boyle's* express rejection of the assertion that association-in-fact enterprises must be "businesslike," we cannot agree with the district court's conclusion that, as a matter of law, an association-in-fact enterprise cannot exist here simply because the couple's alleged bad acts were confined to the management of their personal funds.[4]

We note that the district court cited several cases to back up its suggestion that, absent a business or other distinct operation, Erika and Ben could not constitute an association-in-fact enterprise. But none of those cases actually supports that conclusion. In fact, one case shows that an association-in-fact enterprise *can* consist solely of two people who are married to each other. *See,*

---

[4] The Supreme Court has repeatedly rejected the notion that RICO only targets organized crime in the traditional sense. *See, e.g.*, *Sedima*, 473 U.S. at 499 (RICO is not limited to "being used against mobsters and organized criminals."); *Turkette*, 452 U.S. at 580 (RICO encompasses "both legitimate and illegitimate enterprises.").

12

*e.g.*, *Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-cv-328-FtM-29DNF, 2015 WL 12838168, at *19 (M.D. Fla. July 1, 2015) (plaintiff was substantially likely to establish an association-in-fact enterprise consisting of a husband and wife working together for the common purpose of concealing the proceeds of a fraudulent scheme).  And in another, the court—having already found the enterprise element satisfied by the presence of a "business entity"—summarily declined to recognize the marriage itself as a RICO enterprise simply because "the plaintiff cite[d] no case law" on point.  *Edvisors Network, Inc. v. Husser*, No. 14-062-JJB-RLB, 2014 WL 3853457, at *3 (M.D. La. Aug. 5, 2014).  Moreover, the cases concluding that the requirements for an association-in-fact enterprise were *not* met all turn on infirmities not present here.  *See Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc.*, No. 2:09cv192-MHT, 2011 WL 2893629, at *4 (M.D. Ala. July 19, 2011) (complaint did not allege that members of the alleged enterprise actually carried out the illegal acts); *Paradise Nw. Inc. v. Randhawa*, No. 2:09-cv-02027-MCE-KJN, 2011 WL 1459206, at *2 (E.D. Cal. April 15, 2011) (no shared purpose because complaint did not allege that wife played a meaningful role in her husband's fraudulent business).  So what these cases actually affirm is that a married couple can constitute an association-in-fact enterprise under RICO—or not—depending on the facts of the case.

That brings us back around to the facts of this case.  Under a purpose analysis consistent with *Boyle*, the record contains sufficient evidence for a reasonable juror to find that—although Erika and Ben originally joined together for the purpose of marriage—the couple came together shortly after the consent

13

judgment was entered against Ben for a new purpose, to hinder Al-Rayes's efforts to collect the consent judgment by committing mail and wire fraud. That evidence, viewed in the light most favorable to Al-Rayes, reflects that the couple deposited Ben's income into offshore bank accounts held in Erika's name only, and then transferred some of those offshore funds to their joint U.S. bank account to pay for living expenses. All the while, both Erika and Ben denied the existence of the offshore accounts under oath and made numerous misrepresentations regarding the extent of their financial assets. The record also reflects that the couple purchased real estate jointly, but put the titles to the properties in Erika's name only; eventually, the couple created a trust in Erika's name only, to which they transferred the condo title. Finally, the record contains evidence that the couple formed a corporation, set themselves up as its sole shareholders, and then used its bank account as both a haven for personal funds and a source for personal expenditures. These actions may or may not constitute RICO violations. But they certainly could lead a reasonable juror to conclude that Erika and Ben came together shortly after the consent judgment was entered and orchestrated an asset-concealment scheme for the common purpose of hiding Ben's assets from Al-Rayes. A marriage certificate does not transform alleged mail and wire fraud into ordinary household management.

In sum, to survive summary judgment, Al-Rayes did not need to bolster Erika and Ben's marital relationship with evidence that the alleged association-in-fact enterprise included a business or other separate entity formed by the couple. Nor did he need to provide evidence that Erika and Ben originally married for the

14

purpose of engaging in mail or wire fraud.  Under RICO, the same rules apply to married people as to everyone else.  Because the district court applied a heightened standard for association-in-fact enterprises consisting of married couples when it granted summary judgment in Erika's favor, we must reverse that order.

This opinion addresses only the "enterprise" element of the RICO claims because the district court's order addressed only that element.  Accordingly, nothing in this decision prevents the district court from entering judgment as a matter of law in Erika's favor on some other basis, should that be appropriate.  And because we reverse the order granting summary judgment in Erika's favor, Erika no longer qualifies as a prevailing party under Federal Rule of Civil Procedure 54(d)(1).  We therefore also vacate the district court's order awarding her costs.

**REVERSED, VACATED, AND REMANDED.**