[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10945

_____

D.C. Docket No. 5:16-cv-01595-MHH

DANA HICKMAN,
ROBBIN N. HINES,

                                                         Plaintiffs-Appellants,

versus

SPIRIT OF ATHENS, ALABAMA, INC.,

                                                         Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 19, 2021)

Before WILLIAM PRYOR, Chief Judge, GRANT, Circuit Judge, and ANTOON,[*]
District Judge.

_____

[*] Honorable John Antoon II, United States District Judge for the Middle District of Florida,
sitting by designation.

GRANT, Circuit Judge:

The plaintiffs who filed this False Claims Act suit say they suspected that fraud was afoot at the nonprofit where they worked, and that they were fired for attempting to uncover it. That may or may not be so—the case never made it to trial, so the factual issues were not decided by a jury. But even if the employees' suspicions about both the fraud and their firings are entirely correct, a False Claims Act retaliation claim requires more.

The False Claims Act targets just that—false claims. The Act provides a way for individuals, and ultimately the United States itself, to bring an action to recover damages for false claims made to the federal government—fraudulent billing, for example. And individuals who are fired or otherwise suffer retaliation because of their investigation of a potential False Claims Act suit can also bring retaliation suits.

But for retaliation suits, what kind of connection must there be between the employee's investigation and an actual violation of the Act? Courts have set different standards, and statutory amendments have from time to time required changes in those standards too. The employees here press us to reevaluate our own precedent on the requirements for False Claims Act retaliation cases, correctly noting that this Circuit has not reconsidered our old precedents since the law was amended.

The meaning of that statutory amendment is important to consider, but we decline to do so here for a simple reason: the employees never had reason to believe that their employer made any false claims to the federal government. And

2

without any reason to believe that their employer had filed a false claim against the government, they also did not have any reason to believe that they were investigating a False Claims Act violation, rather than, say, garden-variety fraud. We therefore affirm the dismissal of the employees' action.

## I.

Dana Hickman's tenure as Spirit of Athens's executive director saw more than its share of trouble, especially considering that it lasted only six months.[1]  She began working for the nonprofit, whose mission is "the revitalization and improvement of downtown Athens," in January 2016.  Hickman hired Robbin Hines as her assistant a few months later.

It was a particularly turbulent time for Spirit of Athens—not long before, the organization's 501(c)(3) status had been revoked.  Depending on who is asked, that revocation was either a product of "significant financial irregularities," or just a failure to file certain forms.  Either way, a new accountant was hired to "fix it."  But as he worked to file the organization's tax returns, information was hard to come by:  Spirit of Athens's books, including its checkbook, were kept by the organization's treasurer in her own home rather than at the nonprofit's office.  This arrangement had apparently been approved by the board at some point in the past to make it easier for the treasurer to write checks.

So when Hickman wanted to assist the accountant in filing the 2015 tax forms, the road to the financial records went through the treasurer.  But that road

---

[1] Given the posture of the case, we explain the facts from the perspective of the non-movant appellants.  *Al-Rayes v. Willingham*, 914 F.3d 1302, 1306 (11th Cir. 2019).

was closed when the treasurer refused to provide Hickman with any records. The accountant was informed of the situation, but did not take any action—allegedly to avoid a "contentious" situation with the treasurer, who was also the accountant's neighbor.

Lack of access to the records proved to be only a temporary setback. Though the accountant had informed the board of directors in April that he was unable to prepare the returns without access to the records, he presented the completed 2015 tax returns to Hickman the following month. Hickman signed the returns, but discovered after more review that they were not as detailed as she expected them to be. Her main concern was that almost $61,000 of the organization's expenses were generally categorized as "other expenses" without any further explanation, which seemed odd to her given that the total revenue was about $113,000. Hickman verbally retracted her signature, but the president was less concerned and signed the returns himself.

Hickman wanted to present the 2015 tax returns at a board meeting, and arranged for each board member to receive a copy; still, there was no discussion. Soon after the meeting, one board member did ask for the past seven years of tax returns, but it was no use—Hickman and Hines were unable to locate any of the earlier returns. And when the chairman of the county commission requested certain financial records, they were unable to turn over those as well, though it's not clear why. Hickman and Hines also report that they shared with the president "troubling financial discrepancies" that they discovered while working on fundraising. It seems that no action was taken on any of these issues.

4

The last chapter of the plaintiffs' employment began when, only a few days after the board members were presented with the tax returns, Hickman retained a firm to audit Spirit of Athens. Five days later, Hickman notified the board president of both the impending audit and the county commission chairman's request for records. The president's reaction was swift; he fired the audit firm almost immediately, and two days later, Hickman and Hines met the same fate.

The two sued, arguing that their firing was payback for their attempts to combat the organization's misuse of federal funds. Their vehicle was the False Claims Act, which "prohibits any person from making false or fraudulent claims for payment to the United States." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 411 (2005) (citing 31 U.S.C. § 3729(a)). They used the Act's retaliation cause of action, which, generally speaking, protects employees who are targeted by their employers after they seek to prevent a violation of the Act. *See* 31 U.S.C. § 3730(h)(1).

Hickman and Hines say the retaliation provision gives them cover because, spurred on by opaque tax returns and other questionable financial practices, they were on the verge of revealing fraud perpetrated on the federal government by Spirit of Athens. The pair's claim is grounded in their view that some of the funds used by Spirit of Athens were federal in nature because they originated with the Tennessee Valley Authority—a federal corporation supplying electricity and performing other public works.

Whether or not those funds are "federal," they travel from the TVA to Spirit of Athens through an attenuated process. The TVA possesses property in

5

Alabama, which ordinarily would lead to property taxes. *See, e.g.*, 16 U.S.C. § 831f(a). But rather than paying taxes to the state or local governments where it operates, the TVA provides them with a percentage "of the gross proceeds derived from the sale of power" by the TVA. 16 U.S.C. § 831*l*. Alabama then takes the "in-lieu-of-taxes" funds that it receives from the TVA and distributes them among the counties where the TVA operates. *See* Ala. Code § 40-28-2. Some of this money goes to Limestone County—the home county of Spirit of Athens. *See id.* § 45-42-163. State law, in turn, requires that Limestone County give $5,000 of its allotment to Spirit of Athens. *See id.* § 45-42-163(2)(c)(1)(iv). For our purposes, the key takeaway from this somewhat unorthodox funding stream is that at no point in the process does Spirit of Athens make any representations or claims to the federal government.

Returning to the specifics of this case, after Hickman and Hines filed their lawsuit, Spirit of Athens moved to dismiss, arguing that the suit did not involve federal funds. Following that motion, the district court permitted discovery into the nature of the funding process. Spirit of Athens moved for summary judgment after that phase of discovery was complete.

The district court agreed that the case could not proceed. But its ruling did not hinge on whether the case involved federal funds (for purposes of argument, the court assumed that it did). Instead, it found that Hickman and Hines had failed to make out a prima facie case that they had engaged in protected conduct under the False Claims Act's retaliation provision because the pair could not show that they had a reasonable belief they were combatting fraud that involved making false

6

claims to the federal government.  The district court concluded by explaining that while "Ms. Hickman and Ms. Hines may have lost their jobs because they were on the brink of exposing fraudulent or illegal conduct," the alleged misconduct did not fall within the scope of the False Claims Act's "prohibition on the submission of a false claim as a means of obtaining federal funds."  The pair appealed.

## II.

We review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and resolving reasonable inferences in her favor.  *Al-Rayes v. Willingham*, 914 F.3d 1302, 1306 (11th Cir. 2019).

## III.

For over 150 years, the False Claims Act has prohibited "making false claims for payment to the United States."  *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1086 (11th Cir. 2018).  The Act "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War," and was passed in response to "a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (quotations omitted).  Then and now, those with knowledge of false claims against the government could file recovery lawsuits, also known as "qui tam" actions.  *See* Act of Mar. 2, 1863, ch. 67, §§ 4, 6, 12 Stat. 696, 698; 31 U.S.C. § 3730(b).  Though the Act has been amended, "its focus

7

remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health*, 136 S. Ct. at 1996.

In 1986, Congress added a retaliation provision, protecting employees from being targeted for actions taken "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h) (1986). This Circuit (and others) interpreted that language to mean that employees were protected when a False Claims Act filing "by either the employee or the government, was 'a distinct possibility' at the time the assistance was rendered." *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996); *see, e.g.*, *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001). That holding became known as the "distinct possibility" standard.

Not every court interpreted the retaliation provision as we did. One circuit, for example, decided that reporting a False Claims Act violation to a supervisor did not qualify as protected activity unless the employee pursued a qui tam action. *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). Another identified protected activity so long as an employee "in good faith" believed (and a reasonable employee in similar circumstances might believe) that the employer was "committing fraud against the government." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) (quotations omitted).

In any event, Congress amended the retaliation provision in 2009 and 2010, and the new language is broader than the old. Now, besides protecting employees who take steps "in furtherance of" a False Claims Act suit, the law protects

8

employees who engage in "efforts to stop 1 or more violations" of the False Claims Act. 31 U.S.C. § 3730(h)(1). In other words, the amendments expanded retaliation coverage to at least some set of people who make "efforts to stop" False Claims Act violations—even if those efforts do not lead to a lawsuit or to the "distinct possibility" of a lawsuit. *See United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95–98 (2d Cir. 2017).

This Circuit has not yet considered what the new language means for would-be plaintiffs. Others have. The Fourth Circuit, for instance, applied what it called an "objective reasonableness" standard. *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 (4th Cir. 2018). Under that standard, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate," the False Claims Act. *Id.* No longer does the inquiry center around whether a False Claims Act action "is in the offing"; according to the Fourth Circuit, so long as an employee shows that she tried "to stop at least one violation of the" False Claims Act, it counts as protected activity even absent a "distinct possibility" of an accompanying False Claims Act lawsuit. *Id.* at 201, 202; *see also Singletary v. Howard Univ.*, 939 F.3d 287, 295–96 (D.C. Cir. 2019); *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 765 (10th Cir. 2019); *Chorches*, 865 F.3d at 95–97.

The district court seems to have used a similar approach in interpreting the amended statute, holding that Hickman and Hines must show that they had a "reasonable belief" that Spirit of Athens violated the False Claims Act to establish that they engaged in protected activity. Or at least the district court claimed to

9

apply that standard; the plaintiffs argue on appeal that the court's analysis more closely resembles the "distinct possibility" approach. That old standard (along with our precedent on it), they say, no longer applies after the amendments.

But that dispute—interesting as it is—turns out to be irrelevant here. Even if all that is required to protect an employee under the Act is a "reasonable belief" that a False Claim Act violation has occurred, Hickman and Hines cannot meet that standard. They are, at a minimum, required to show that the activity they were fired over had *something* to do with the False Claims Act—or at least that a reasonable person might have thought so. And the False Claims Act requires a false claim; general allegations of fraud are not enough. *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103 (11th Cir. 2020). After all, liability under the Act "arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Id.* (quotation omitted).

That requirement matters. An organization might commit, and its employees might believe it has committed, any number of legal or ethical violations—but the Act's retaliation provision only protects employees where the suspected misdeeds are a violation of *the False Claims Act*, not just of general principles of ethics and fair dealing. It is not enough for an employee to suspect fraud; it is not even enough to suspect misuse of federal funds. In order to file under the False Claims Act, whether in a qui tam or a retaliation action, an employee must suspect that her employer has made a false claim to the federal government. *See id.*

10

Based on the allegations here, Hickman and Hines cannot satisfy that test. Whether or not the annual funds from the TVA could be deemed "federal," they went to Spirit of Athens with neither a claim to the federal government nor any limits imposed by the TVA—and that was not a mystery to Hickman and Hines. Indeed, their testimony was that they knew that the annual TVA-related funds came to the nonprofit automatically (by operation of law), rather than as a result of representations or claims submitted to the federal government. As Hickman testified, "it was the law" that the "TVA would distribute that money to Spirit of Athens. So it wasn't something we had . . . to go back to fill out any paperwork to say we are needing this money, we are asking for appropriations for that." Neither Hickman nor Hines believed that the TVA imposed any limits on how the in-lieu-of-taxes funds were to be used or reported, or that Spirit of Athens had made any request for the funds.

Those objective realities decide this case. Hickman and Hines may have had a sincere belief that the False Claims Act was violated, but a sincere belief is not the same thing as a reasonable one. The False Claims Act's retaliation provision thus affords them no relief, even if we apply the "reasonable belief" standard that they offer as the best reading of the amended retaliation provision.

Hickman and Hines's retaliation action would also fail under our existing "distinct possibility" standard. No claims means no false claims, and no false claims means no distinct possibility of a False Claims Act lawsuit. In short, we cannot see a "distinct possibility" of a false claims action where facts within the knowledge of the employee foreclosed False Claims Act liability from the start.

11

That also means we have no occasion to examine any gap between the "distinct possibility" and "reasonable belief" standards—the plaintiffs' retaliation claims fail under any standard.

*    *    *

We echo the district court's concern that Hickman and Hines may well have acted in good faith in an attempt to uncover what they feared were shady practices. But the False Claims Act is not a general anti-fraud statute; whether the plaintiffs' suspicions were well-grounded or groundless, it offers them no relief.

**AFFIRMED.**