[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11618

_____

EMESE SIMON,
M.D., ex rel,
FLORIDA REHABILITATION ASSOCIATES, PLLC,

                                                    Plaintiffs-Appellants,

STEPHEN BERKES,
M.D., ex rel,

                                                    Plaintiff,

*versus*

HEALTHSOUTH OF SARASOTA LIMITED PARTNERSHIP,
an Alabama Limited Partnership, et al.,

                                                    Defendants,

HEALTHSOUTH REAL PROPERTY HOLDINGS, LLC,
a Delaware Limited Liability Company,
HEALTHSOUTH CORPORATION,
a Delaware corporation now known as Encompass Health
Corporation Florida,
ENCOMPASS HEALTH REHABILITATION HOSPITAL OF
SARASOTA LLC,
a Delaware limited liability company,
f.k.a. Healthsouth Rehabilitation Hospital of Sarasota, LLC,
f.k.a. Healthsouth of Sarasota Limited Partnership,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:12-cv-00236-VMC-AEP

_____

Before WILSON, BRANCH, and TJOFLAT, Circuit Judges.

PER CURIAM:

This appeal relates to a retaliation claim brought under the
False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* The appellant,
Dr. Emese Simon, originally asserted qui tam and retaliation claims
under the FCA against HealthSouth entities. The original

complaint alleged that HealthSouth employees submitted fraudulent statements to the government to defraud Medicare and Medicaid, specifically those involving the allegedly fraudulent diagnosis of disuse myopathy. The United States did not intervene in the case and later settled with HealthSouth. Simon's qui tam claims were dismissed through a joint stipulation of dismissal, but the district court retained her claim for retaliation under 31 U.S.C. § 3730(h). In that claim, Simon alleged that she complained to HealthSouth about the use of allegedly false diagnoses, and, because of her complaints, Simon faced various adverse employment actions and was ultimately constructively discharged.

The district court granted summary judgment for HealthSouth, finding that Simon could not show that she had an objectively reasonable belief that HealthSouth was violating the FCA given the facts presented. Because we agree with the district court that an employee needs at least an objectively reasonable belief to recover for retaliation under the FCA, and because Simon cannot show one here, we affirm.

## I.    Background

The FCA "prohibit[s] making false claims for payment to the United States." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1287 (11th Cir. 2021) (quotations omitted). As relevant here, the FCA allows private plaintiffs "with knowledge of false claims against the government" to file "qui tam" actions—recovery lawsuits brought on the government's behalf. *Id.* at 1287–88; *see also* 31 U.S.C. § 3730(b). The FCA also creates a private right of

action for an individual whose employer retaliates against her for participating in an FCA action or in response to other efforts the employee engages in to oppose a violation of the FCA. *Id.* § 3730(h)(1); *see Hickman*, 985 F.3d at 1287–88 (discussing the evolution of the False Claims Act and its retaliation provision); *accord United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1086 (11th Cir. 2018) (discussing the three different enforcement mechanisms of the FCA). It protects employees against retaliation for conduct that is "in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h)(1). The FCA also protects contractors from retaliation. *See id.* § 3730(h).

Defendants (collectively "HealthSouth") operate a for-profit inpatient rehabilitation facility (IRF) in Sarasota, Florida. Medicare and Medicaid training materials establish that the decision to admit a patient to an IRF must be made by a physician and "cannot be delegated to a physician extender."[1]

In addition, to be classified as an IRF and thus qualify for reimbursement by the Centers for Medicare and Medicaid Services (CMS) through a prospective payment system,[2] a hospital must

---

[1] A physician extender is a medical professional that is not a doctor, such as a physician assistant, nurse practitioner, or clinical nurse specialist.

[2] Under Medicare and Medicaid, a prospective payment system allows for "payment for the operating and capital-related costs of inpatient hospital

21-11618            Opinion of the Court                 5

serve an "inpatient population of whom at least 60 percent required intensive rehabilitation services for treatment of one or more of [13 specific] conditions" ("CMS 13") or for treatment of one of those conditions as a serious comorbidity that "has caused significant decline in functional ability in the individual."    42 C.F.R. § 412.29(b)(1)–(2).

The government bases IRF funding compliance, in part, on the inpatient rehabilitation facility's submission of diagnostic codes to CMS. These codes are known as the International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) codes and are submitted through an IRF-Patient Assessment Instrument which has "patient clinical, demographic, and other information, which helps classify patients into payment groups based on clinical characteristics and expected resource needs."

The plaintiff Simon is a physiatrist, a specialty doctor who focuses on "in patient rehabilitation" and "neurological injuries," who operated an outpatient medical practice through her company, Florida Rehabilitation Associates, in the Sarasota, Florida area. Simon was also an attending physician with admitting privileges at HealthSouth Sarasota Hospital and had Medical Direction Services and independent contractor agreements with HealthSouth. She claims that in 2006, HealthSouth began

services furnished by hospitals subject to the systems (generally, short-term, acute-care hospitals) [to be] made on the basis of prospectively determined rates and applied on a per discharge basis." 42 C.F.R. § 412.1.

encouraging her and other physicians to use a diagnoses of disuse myopathy for their patients, representing to the doctors that such a diagnosis qualified as one of the 13 specified conditions in 42 C.F.R. § 412.29(b)(2).  According to Simon,

> A true myopathy is a muscle disease. The condition of myopathy has widely varying etiologies, including congenital or inherited, idiopathic, infectious, metabolic, inflammatory, endocrine and even drug-induced or toxic. These etiologies that result in myopathy, which have symptoms such as proximal muscle weakness, impaired functions of daily life, and, rarely, muscle pain and tenderness, should properly be coded as ICD-9 Code 359.89.

Simon, however, believed that disuse myopathy was a fraudulent diagnosis created by HealthSouth to generate more CMS 13 diagnoses to meet the 60% threshold for IRF classification and Medicaid funding.  Simon alleges that when she complained about the internal directive and refused to diagnose patients fraudulently, HealthSouth constructively discharged her by threatening, demoting, and investigating her, as well as by limiting her admitting privileges and restricting the assignment of her patients to her.

Although Simon never complained in writing about alleged fraud,[3] she maintains she made the following verbal complaints. According to her declaration, Simon—between 2008 and 2012—"made numerous complaints about the use of false diagnoses to ensure that patients who were unfit physically were nonetheless admitted to HealthSouth Sarasota." She made these verbal complaints in meetings with Dan Eppley (the CEO of HealthSouth Sarasota until summer 2010) and Marcus Braz (the next CEO), informing them that "the improper use of the codes for disuse myopathy . . . amounted to fraud." She also informed HealthSouth's Medical Director Alexander DeJesus that using false diagnoses of disuse myopathy was fraudulent. Furthermore, she "publicly objected" to a March 2010 presentation and PowerPoint

---

[3] Simon averred that she did not mention "any fraud, false diagnoses or false billing to the government" in any letter to the executives of HealthSouth because she "thought it best to avoid putting the topic in writing to help preserve [her] position at HealthSouth Sarasota for financial reasons."

During her time at HealthSouth, Simon lodged various complaints in writing about other issues, however. For instance, Simon complained multiple times over the years to the executives of HealthSouth about its practice of distributing patients to its physicians based on their geographical location, and she requested that it be discontinued. These complaints often recounted allegedly unpleasant conversations that Simon had with HealthSouth's Medical Director, Dr. Alexander DeJesus. Her written complaint details a conversation with Dr. DeJesus over the distribution of patients, during which he purportedly "threatened [her] 'not to ever challenge'" how Dr. DeJesus distributed patients among the doctors.

on disuse myopathy provided by Lupe Billalobos, HealthSouth's former National Healthcare Information Management Director, West.[4] Simon claims that she stated: "I've never heard of this. I've never read about it. Disuse myopathy is not existent. Cannot use it."[5]

After the March 2010 presentation, both Dr. DeJesus and Dr. Hume investigated the disuse myopathy diagnosis and began using it. Further, HealthSouth produced the expert report of Dr. Randall Braddom, a rehabilitation physician with 51 years of practice, and former President of the American Academy of Physical Medicine & Rehabilitation, who opined that "Disuse Myopathy is Histologically and Clinically an Accurate and Appropriate Diagnosis."

---

[4] As part of her job duties, Billalobos made presentations at HealthSouth Sarasota and other hospitals and educated physicians on how to document the diagnoses so that coders could accurately code them for purposes of CMS billing.

Billalobos testified that disuse myopathy was a type of "myopathy not elsewhere classified," a subcategory under the broader myopathy label. At the March 2010 presentation, the slide on disuse myopathy as a CMS 13 diagnosis stated that "there are no good, reliable, definitive references for use of this diagnosis."

[5] Both Dr. Daniel Hume, a doctor at HealthSouth who attended the same presentation, and the presenter, Billalobos, testified that they did not hear Simon voice an objection to disuse myopathy.

21-11618                Opinion of the Court                9

Even Simon herself used the disuse myopathy diagnosis. When shown medical records she completed, Simon admitted that she diagnosed patients with disuse myopathy for months immediately following the March 2010 presentation. Simon testified that she did so "mostly [because of] pressure" being put on her by certain people at the hospital. She further testified that she was told to "watch out and play by the rules" or she would be fired and that she was promised supporting documentation for the legitimacy of the diagnosis which was never given to her. But when asked about a specific patient whom Dr. Hume had diagnosed with disuse myopathy, among other things, Simon admitted that "[e]very physician could have a different opinion." Simon further admits that physiatrists can disagree over the appropriate diagnosis for a patient and that she and Dr. DeJesus likely had a difference of opinion on disuse myopathy.

In November 2010, the Medical Executive Committee of HealthSouth initiated an investigation of Simon after she completed history and physical forms for a patient who had not yet been admitted to HealthSouth Sarasota and whom she had not examined. HealthSouth's CEO Braz averred that he decided to stop assigning patients to Simon pending the results of the investigation which ended in January 2011. Simon could not admit patients unless she had a signed letter from the referring doctor that they wanted her to take care of their patients. Braz informed Simon of this change in assignments in November 2010 but the restrictions were not lifted after the investigation.

Accordingly, in November 2010 Simon procured 25 letters from local doctors who stated generally that they wanted their patients treated by Simon, but Dr. DeJesus allegedly ignored these letters unless each individual patient referral order specifically mentioned Simon. In January 2011, the medical executive committee conducting the investigation concluded that Simon's incident was an "isolated error" and instituted six months of monitoring to ensure that her documentation satisfied requirements. The monitoring period ended without incident.

In February 2012, HealthSouth terminated Simon's Medical Direction Agreement, which required her to work 10 hours per month as a medical director of the spinal cord injury program, but did not terminate her medical staff membership or privileges at the hospital. On or about April 16, 2012, Simon requested and was granted a medical leave of absence.[6] Simon did not return to HealthSouth Sarasota once her leave was complete and allowed her admitting privileges to expire.

## II.    Procedural History

Simon filed a qui tam action under seal on February 3, 2012, alleging that HealthSouth had engaged in various acts of fraud

---

[6] Simon said that before she got sick, she had already planned to take leave because at that point she had been stripped of all but two patients and could not earn a living.

21-11618               Opinion of the Court                11

against the government,[7] as well as the fraudulent use of the disuse myopathy diagnosis. She included multiple counts for violations of the FCA, including a retaliation claim under 31 U.S.C. § 3730(h). In June 2019, the United States intervened for the purposes of settlement. Thereafter, the United States settled with HealthSouth and filed a joint stipulation with Simon, seeking dismissal with prejudice of all FCA claims except Simon's claim for retaliation, her claim for attorney's fees and costs, and some related claims asserting that HealthSouth committed fraud against the State of Florida.

In July 2019, the Court dismissed Simon's qui tam action with prejudice but retained jurisdiction "to resolve any claims from [Simon] pursuant to [the FCA's retaliation provision], as well as any claims for attorney's fees and costs . . . and claims related to fraud on the State of Florida."

Thereafter, Simon and Florida Rehabilitation Associates, PLLC, "a Florida professional limited liability company which is wholly owned and operated by [] Simon," filed a Third Amended Complaint.[8] In it, Simon alleged that she had engaged in protected conduct under the FCA by objecting multiple times between early 2008 and her constructive discharge in 2012 to HealthSouth's practice of falsifying diagnoses such as disuse myopathy so that

---

[7] These other acts of fraud are not at issue in this appeal.

[8] Simon's Third Amended Complaint did not include any state law claims.

patients could be admitted to meet the hospital's 60% rule for IRF claims and by filing a qui tam action in February 2012. She maintained that between 2008 and 2012, HealthSouth harassed and demoted her because of her protected conduct, leading to her constructive discharge in 2012, in violation of the FCA's retaliation provision, 31 U.S.C. § 3730(h).

The retaliation case proceeded through discovery and the parties cross-moved for summary judgment as to whether Simon could make a prima facie case of retaliation. Specifically, HealthSouth argued Simon could not show she had engaged in protected activity because she could not show she had an objectively reasonable belief that HealthSouth submitted false claims based on disuse myopathy. Simon moved for partial summary judgment arguing she had made a prima facie case for retaliation. The district court granted HealthSouth's motion for summary judgment and denied Simon's.

The district court explained that the FCA's retaliation provision protects two types of conduct: (1) conduct in furtherance of FCA litigation, and (2) other efforts to stop violations of the FCA. Simon's conduct fell under the second prong, which meant that to make a prima facie case for retaliation she needed to show she engaged in protected activity to stop violations of the FCA. The district court noted that other courts have held that a party claiming protection under the second clause must have an objectively reasonable belief that an employer was engaged in violations of the FCA. Therefore, the court reasoned that Simon

needed to show that she had not only a subjective belief that HealthSouth was violating the FCA, but that this belief was objectively reasonable in light of the facts and record presented. The district court noted that because a reasonable difference in medical opinion on the validity of a diagnosis does not create a false claim for purposes of the FCA, Simon's belief that disuse myopathy was fraudulent was not objectively reasonable. The district court also noted that Simon had no knowledge of HealthSouth's billing practices and never saw the bills sent to the government. Thus, she had no objectively reasonable belief that HealthSouth actually submitted such claims to the government. Simon timely appealed from the grant of summary judgment in HealthSouth's favor.

## III.    Standard of Review

We review the district court's grant of summary judgment *de novo*, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, and applying the same standard as the district court. *Rodgers v. Singletary*, 142 F.3d 1252, 1253 (11th Cir. 1998).

## IV.    Discussion

Simon argues that the district court improperly heightened the objective standard for a False Claims Act retaliation claim. She argues that under the proper standard, she presented sufficient facts to support an objectively reasonable belief that fraud was occurring at HealthSouth. Additionally, she argues that there is a genuine issue of material fact as to the reason for Simon's

termination and the causal connection between her protected acts and constructive discharge.

The retaliatory discharge provision of the False Claims Act states:

> (h) Relief from retaliatory actions.—
>
> (1) In general.—Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).[9]

---

[9] Similar to the antiretaliation provision of the FCA, Title VII's antiretaliation provision provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any

21-11618                Opinion of the Court                15

In an FCA retaliation case, as in a Title VII retaliation case, a plaintiff "must begin by establishing a prima facie case," by showing that "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997).[10]  We resolve Simon's appeal at the first step of this framework.  Because Simon did not engage in statutorily protected activity the district court correctly granted summary judgment as to her FCA retaliation claim.

---

practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

[10] Other circuits have used this Title VII framework in a FCA retaliation case. *See, e.g.*, *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 32 (1st Cir. 2012) (citing to a Title VII case for knowledge element to establish prima facie case); *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 77–78 (3d Cir. 2018) (discussing Title VII retaliation to determine the causation standard for FCA retaliation); *United States ex rel King v. Solvay Pharms., Inc.*, 871 F.3d 318, 333 (5th Cir. 2017) (same); *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 432 (6th Cir. 2021) (applying Title VII definition of employee to same term in FCA retaliation provision).  Similarly, in *Nesbitt v. Candler County*, 945 F.3d 1355, 1358–59 (11th Cir. 2020), we noted the similarity between the antiretaliation provisions of the FCA and Title VII, holding "the but-for causation standard applies to claims under the antiretaliation provision of the [FCA] just as it does to the antiretaliation provision of Title VII . . . ."

We begin our analysis by setting out the applicable legal standard for evaluating the "statutorily protected activity" element of an FCA retaliation claim. The False Claims Act prohibits any person from "knowingly present[ing], or causing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The FCA antiretaliation provision protects employees or contractors, like Simon, from being targeted for (1) "lawful acts done . . . in furtherance of an action under [the FCA]" and (2) "other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1); *see also Hickman*, 985 F.3d at 1288.

We previously assumed without deciding that a plaintiff, like Simon, who argues that her conduct was in the form of "other efforts" to stop a FCA violation[11] must at least show that she had an objectively reasonable belief that her employer violated the FCA to establish that she engaged in protected activity. *Hickman*, 985 F.3d at 1289.[12] The parties here do not dispute that the objectively

---

[11] Neither party argued below or on appeal that the first form of protected action, engaging in "lawful acts . . . in furtherance of" a FCA action, applied to Simon's conduct at issue in this retaliation action, even though she filed a qui tam action in 2012. Thus, we do not consider whether Simon engaged in statutorily protected activity in this manner.

[12] In *Hickman*, we noted that before the FCA retaliation provision was amended in 2009 and 2010, we held that "employees were protected when a False Claims Act filing by either the employee or the government, was a distinct possibility at the time the assistance was rendered." *Hickman*, 985

reasonable belief standard applies, so we again assume without deciding that this is the applicable standard.

There is no dispute that Simon possessed a sincere, subjective belief that HealthSouth was committing fraud by using a fabricated disuse myopathy diagnosis. Instead, the parties dispute, and the district court's decision hinged on, the objective reasonableness of that belief. Our decision today is guided by our recent False Claims Act decision in *Hickman*. In that case, we explained what objectively reasonable belief looks like:

> [Employees are] at a minimum, required to show that the activity they were fired over had something to do with the False Claims Act—or at least that a reasonable person might have thought so. And the False Claims Act requires a false claim; general allegations of fraud are not enough. After all, liability under the Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures.

F.3d at 1288 (quotations omitted). Therefore, the question in *Hickman* was whether, post amendment, an employee would still have to show that a False Claims Act filing was a distinct possibility for the employee's conduct to qualify as protected activity or if an employee only had to show a "reasonable belief" that the employer was violating the FCA at the time the employee acted. *Id.* at 1288–89. Because the court found that the plaintiff could not meet the "reasonable belief" standard, we proceeded without deciding what standard applied. *Id.* at 1289.

That requirement matters. An organization might commit, and its employees might believe it has committed, any number of legal or ethical violations—but the Act's retaliation provision only protects employees where the suspected misdeeds are a violation of the False Claims Act, not just of general principles of ethics and fair dealing. It is not enough for an employee to suspect fraud; it is not even enough to suspect misuse of federal funds. In order to file under the False Claims Act, whether in a qui tam or a retaliation action, an employee must suspect that her employer has made a false claim to the federal government.

*Hickman*, 985 F.3d at 1289 (internal citations and quotations omitted).

Simon cannot meet the burden of showing she had an objectively reasonable belief that HealthSouth was submitting false claims to the government. While she has established that she subjectively believed that HealthSouth was improperly encouraging employees and contractors to diagnose patients with disuse myopathy—a condition which she maintains does not exist—and were fraudulently billing for that diagnosis, "general allegations of fraud are not enough." *Id.* Instead, "the False Claims Act requires a false claim." *Id.* Therefore, to survive a motion for summary judgment, Simon must provide facts that establish that she had a "'reasonable belief' that a False Claim Act violation ha[d] occurred"—that a false claim for payment was submitted to the government. *Id.* However, Simon has not established that disuse

21-11618          Opinion of the Court          19

myopathy is not a valid condition such that it is a false claim to submit billing based on it for government reimbursement.

While Simon testified to her own belief in the illegitimacy of the disuse myopathy diagnosis, she offered no evidence that she had an objectively reasonable belief that the doctors who diagnosed their patients with disuse myopathy did so purposefully and wrongly to fraudulently receive money from the government. Thus, she had no objectively reasonable belief that fraudulent billing—*i.e.*, a false claim—was occurring.   Dr. DeJesus and Dr. Hume testified that they believed disuse myopathy to be legitimate.  Additionally, Simon herself admitted to diagnosing her patients with disuse myopathy and agreed that doctors can disagree about diagnoses.  And while Simon claimed she "felt pressure" to use the diagnosis, she did not say her own diagnoses of the condition were false or fraudulent.

Moreover, in *United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019), we explained that

> a reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments—or any claims based on them—are false under the FCA.  A properly formed and sincerely held clinical judgment is not untrue even if a different physician later contends that the judgment is wrong.

*Id.* at 1297.  In other words, Simon's medical opinion that disuse myopathy is not a legitimate diagnosis does not establish that the

judgments of other doctors who diagnosed disuse myopathy—or any claims based on those doctors' judgments—were false for purposes of the FCA.

Simon argues that the standard in *AseraCare*, established in the context of a FCA claim brought by the government under 31 U.S.C. § 3729, is not relevant to making a prima facie case for a reasonable belief of fraud in a FCA retaliatory discharge claim under 31 U.S.C. § 3730(h)(1). She argues that a heightened standard of falsity applies to claims for FCA fraud but not claims for FCA retaliatory discharge. Yet in *Hickman*, we clarified that "the False Claims Act requires a false claim," including retaliation claims under the FCA, and "general allegations of fraud are not enough." *Hickman*, 985 F.3d at 1289. Additionally, in the Title VII retaliatory discharge context, we have held that "[t]he objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *see also Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998) (stating that, in the Title VII context, while "[t]he plaintiffs also argue that when judging the reasonableness of their belief, we should not charge them with substantive knowledge of the law . . . [w]e reject the plaintiffs' argument because it would eviscerate the objective component of our reasonableness inquiry"). Therefore, Simon must provide facts showing that a "reasonable person" might have thought that a false claim, which

21-11618                Opinion of the Court                21

cannot consist of "difference[s] of opinion among physicians," was being conveyed to the government for money. *See id.*; *AseraCare*, 938 F.3d at 1297. She has not done so.[13]

Finally, Simon cites to HealthSouth's settlement agreement with the government and the DOJ's press release about the case as evidence that her belief in the False Claims Act violation was objectively reasonable. However, "courts don't consider settlements as evidence of the validity of underlying claims." *Morrissey v. United States*, 871 F.3d 1260, 1271 (11th Cir. 2017); *see also* Fed. R. Evid. 408 (explaining that evidence of a settlement cannot be used "to prove or disprove the validity or amount of a disputed claim"). Additionally, allegations from Simon's qui tam suit cannot be used as evidence of the validity and reasonableness

---

[13] To show that the diagnoses were false, Simon could have submitted evidence of the "certifying physician fail[ing] to review a patient's medical records or otherwise familiarize himself with the patient's condition before" diagnosing that patient. *AseraCare*, 938 F.3d at 1297. Additionally, Simon could have produced evidence showing that Dr. Hume or Dr. DeJesus, or even she herself, "did not, in fact, subjectively believe that [the] patient [had disuse myopathy] at the time of certification." *Id.* She also could have produced expert testimony showing "that no reasonable physician could have concluded that a patient [had disuse myopathy] given the relevant medical records." *Id.* As we explained in *AseraCare*, "[i]n each of these examples, the clinical judgment on which the claim is based contains a flaw that can be demonstrated through verifiable facts." *Id.*

of her belief in fraudulent activity by HealthSouth because the mere existence of pleadings does not prove reasonableness. *See* *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012) ("[The plaintiff] also contends that the district court abused its discretion by not considering the complaints she proffered from other lawsuits. That contention is without merit because pleadings are only allegations, and allegations are not evidence of the truth of what is alleged.").

Because Simon cannot show that she possessed a "reasonable belief" that HealthSouth violated the FCA, she cannot show that she engaged in statutorily protected conduct and was retaliated against as a result, in violation of § 3730(h). Accordingly, we affirm.

**AFFIRMED.**